```
CD:EAL
F#2002R01475
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA
                                         Cr. 02-948(NGG)(SMG)
    -against-

JACK ROBINSON

         Defendant.

- - - - - - - - - - - - - - - - X
```

                      THE GOVERNMENT'S POST-
                      <u>FATICO</u> HEARING BRIEF

```
                                    ROSLYNN R. MAUSKOPF
                                    UNITED STATES ATTORNEY
                                    EASTERN DISTRICT OF NEW YORK
                                    One Pierrepont Plaza
                                    Brooklyn, NY 11201




ELIZABETH A. LATIF
COLLEEN KAVANAUGH
Assistant United States Attorneys
     (Of Counsel)
```

**<u>PRELIMINARY STATMENT</u>**

1

Over 290 large boxes full of stolen Chanel makeup, perfume, and body treatments were found by law enforcement agents at a perfume store owned by the defendant Jack Robinson's wife in July 2002.  Robinson admitted that he had acquired those products in the summer of 2001 and that he had known that the products were stolen at the time he acquired them.  Photographs of the stolen merchandise reveal that sale of these products was likely a lucrative business for Robinson – many of the products are in perfect condition and all of the products possess the esteemed "Chanel" brand name or the name of a luxury brand connected to Chanel.  Indeed, an entire secondary market exists for such luxury products, be they new, slightly imperfect, unpackaged, refurbished, and even damaged, and the value of such products on that market is at or near their full retail price.  The United States Sentencing Guidelines provide that Robinson should be punished for his crime in a manner that corresponds to the value of the goods.  In fashioning Robinson's sentence, "[t]he court need only make a <u>reasonable estimate</u>" of the value of the goods.  U.S.S.G. § 2B.1.1, cmt. n.2(C)(emphasis added).  For the reasons set forth in further detail below, a reasonable estimate of the value of the stolen Chanel makeup, perfume and body treatments is approximately $650,000, which represents the full retail value of the products on the non-traditional, "secondary" market.

**FACTUAL BACKGROUND**

I.   The Arrest and Conviction of Robinson

On May 29, 2002, law enforcement agents received information that the defendant Jack Robinson planned to burn down the premises located at 1458 Hylan Boulevard, Staten Island, New York, on July 4, 2002. (PSR ¶ 3). Agents identified the premises as L'Image Perfume and Cosmetics, Inc. ("L'Image"), a perfume business owned by Robinson's wife. Id. Agents also received information that Robinson was in possession of stolen perfumes and cosmetics and had previously committed arson. Id.

On July 1, 2002, a search warrant for the premises located at 1458 Hylan Boulevard was issued by then-Chief Magistrate Judge Joan M. Azrack. (PSR ¶ 5). On July 4, 2002, the search warrant was executed, following an entry facilitated by Robinson. Id. Pursuant to the search warrant, agents recovered, among other things, 290 boxes and 11 bags of Chanel products. (Id. ¶ 6); (GA 63). Additionally, agents observed a propane tank used to re-shape lipstick and brushes. (Id.) At that time, Gary Hunsinger, the Vice-President of Manufacturing and Engineering of Chanel, identified the products as having been stolen from the Genco Return Center in Pittston, Pennsylvania.

Robinson was subsequently arrested and an indictment was returned charging him with knowingly and intentionally receiving, possessing, concealing and storing stolen goods, wares and merchandise, the value of which exceeded $5,000, in violation of 18 U.S.C. § 2315. Prior to pleading guilty to the indictment, Robinson filed an affidavit stating that, at the time of his offense, he did not know that the Chanel merchandise was stolen.

3

(PSR ¶ 11).

On September 3, 2003, Robinson pleaded guilty to the one-count indictment. At that time, Robinson admitted that he did in fact know that the Chanel products had been stolen at the time of his offense. (PSR ¶ 14); (Robinson Plea Transcript("Plea Tr.") 19).

As reflected in the Presentence Report, the loss to Chanel was originally estimated to be $1.5 million and later, the total retail value of the stolen Chanel products was estimated to be $679,831 and the wholesale value to be $407,900. Second Addendum to PSR. The defendant objected to this calculation and, on June 20, 2006, a hearing was held pursuant to United States v. Fatico, 603 F.2d 1053 (2d Cir. 1979), in order to establish the value of the goods.

II. Fatico Hearing

A. The Government's Expert Witness

At the Fatico hearing, the government presented the testimony of Michael Murphy, the Senior Vice President and Chief Financial Officer of Chanel. The court found Mr. Murphy qualified to testify as an expert in the value of Chanel products, both in the regular marketplace, (GA 36-37), as well as on the secondary market, (GA 44).

As noted above, the Chanel products recovered from Robinson's possession were diverted from the Genco Return Center in Pittston, Pennsylvania ("Genco"). Chanel and its retailers had previously sent those products to the Genco facility for

4

"returns processing." (GA 45). Chanel and its retailers send retail customer returns and "trade" returns, such as overstock, out-of-season colors, or items that are selling well, to Genco for an accounting and an inspection in order to determine the final disposition of the products. (GA 45-46).

Mr. Murphy testified that, when a product arrived at Genco, the item was scanned into a computerized accounting system to record certain information about the product, such as the product's name, its characteristics, and the store from which it was returned. (GA 47-49). Then, employees of Genco would inspect the product and place it in a specific category, using criteria given to Genco by Chanel. (GA 47-51). There are roughly three categories of items: (1) those that can go directly back into Chanel's inventory and/or to the Chanel company store, (2) items to be refurbished, and (3) items to be destroyed. (GA 47, 50-51, 125). Mr. Murphy testified that some items returned to the Genco facility are in perfect condition and are considered "first quality" inventory; such items go directly back into Chanel's inventory and are sold in the normal channels of distribution. (GA 51). He also testified that other items are refurbished and then sent back into Chanel's inventory. (GA 51).

Mr. Murphy further testified that some of the items are designated by Chanel/Genco as "auto destroy." (GA 52). The items that fall into this category, however, are not necessarily unpackaged, used, or otherwise damaged. (GA 52). Moreover, items designated "auto destroy" are not automatically destroyed.

5

(GA 52). Rather, as Mr. Murphy testified, Genco sends a list of such items to Chanel's headquarters in Piscataway, New Jersey, and Chanel determines whether the products can be refurbished or otherwise utilized, including sale at the company store. (GA 53, 55, 57, 125). After making this determination, Chanel asks Genco to send specified items to Chanel for further inspection and, possibly, refurbishment and/or resale. (GA 55-56, 57, 125).

Notably, Mr. Murphy testified that items marked "auto destroy" could be resold on at least two different types of markets outside the normal distribution channels: (1) a "secondary or diversionary market" and (2) a "barter" market.[1] (GA 58). Mr. Murphy defined "secondary or diversionary markets," as outlets or retail establishments that buy in bulk from retailers or manufacturers and sell products in various types of retail settings. (GA 38). Agents from secondary or diversionary markets will pay wholesalers or retailers approximately twenty to twenty-five percent above wholesale for returned, overstocked, or damaged merchandise. (GA 42-43, 58, 59, 61).

Mr. Murphy further testified that "barters," who differ from other types of "secondary or diversionary" agents, seek to obtain "almost any product, good, bad or indifferent," and will "give fair value for it, often times in services or goods or in

---

[1] Mr. Murphy testified that the basis of his general knowledge as to such markets comes from experience with his former employer, Gillette, as well as his own purchases of Chanel products from secondary outlets, as well as monthly calls to Chanel from barter agents seeking to obtain Chanel items. (GA 37-44).

6

like kind value, often times at full retail value." (GA 39, 43). According to Mr. Murphy, barter agents will offer wholesalers or retailers cash, hotel rooms, airline tickets, trips, and other such items in exchange for returned, overstocked, or damaged product, and often at full retail value. (GA 38-39, 59). Mr. Murphy also testified that although Chanel has not previously sold "returned, overstocked, or damaged merchandise" on a secondary or barter market, it is possible for Chanel to do so, and Chanel routinely receives calls from those markets seeking that type of merchandise. (GA 58, 62).

Mr. Murphy also testified as to the value of the goods recovered from Robinson's possession on the secondary and barter markets. Chanel conducted an appraisal of the products recovered pursuant to the aforementioned search, (GA 64, 108, 124; Gov't Ex. 1.). Chanel estimated the retail value of the products to be $679,831 and the wholesale value to be $407,900. (Gov't. Ex. 1). Mr. Murphy testified that he reviewed the appraisal and found mathematical errors in the amount of approximately $25,000. (GA 79-80). According to Mr. Murphy, therefore, the actual retail value of the items was approximately $650,000.[2]

---

[2] Mr. Murphy testified that there were some inconsistencies between the worksheets supporting the appraisal and the Chanel 2002 product price list; that notwithstanding, he also testified that he examined photographs of the recovered goods and, based on this examination and his knowledge of Chanel's 2002 prices, he believed the fair market value of the goods to be approximately $650,000. (GA 79-80). The government submits that the appraisal together with Mr. Murphy's evaluation constitute a "reasonable estimate" under the Guidelines.

Mr. Murphy further testified that Chanel could obtain approximately $650,000 for the goods in some combination of cash, services, and/or items from a barter for the goods, who would presume that the lot of goods would contain some first quality merchandise and some used, damaged, or tester products. (GA 76-79). Mr. Murphy also testified that Chanel could obtain approximately $480,000 from a secondary or diversionary agent for the goods, i.e., approximately twenty percent above the wholesale value of $400,000, (GA 74-75, 78). Mr. Murphy testified that a secondary agent would also presume that some of the merchandise in the lot would be first quality and some second quality (empty jars, testers, etc.). (GA 73-75).

B. The Defendant's Expert Witness

Following the government's presentation at the Fatico hearing, Robinson presented the expert testimony of Jeffrey Kunkle, an employee of Consolidated Auctioneers and Liquidators. Mr. Kunkle testified that, in August 2003, he had done an appraisal of the goods recovered from Robinson's possession. (GA 138). His appraisal included a physical inspection of ten percent of the goods, or approximately thirty boxes, and a photographic examination of the remaining ninety percent of the goods. (GA 130-31). Mr. Kunkle admitted that, in creating his appraisal, he used worksheets created by the defendant and the defendant's wife that described their views regarding the quantity and quality of the recovered goods. (GA 159-60). He also admitted that there were errors in his valuation and that

8

the errors stemmed from his reliance on the description of the boxes provided by Robinson and his wife.  For example, Mr. Kunkle's appraisal described Box #12 as containing "Cosmic Radiance 1999 Limited Edition" product.  A review of the photograph of Box #12 reveals, however, that it did not contain such product.  (Gov't Ex. 2; GA 161-62).   Mr. Kunkle admitted that he did not view a photograph of Box #12, but rather, relied on the information given to him by the defendant and his wife as to what was contained in Box #12.  (GA 159).

     Mr. Kunkle further admitted that he discounted the value of the goods based on his view of whether the products were outdated as of August 2003, which was one year after the products were recovered from Robinson's possession, (GA 155-56), and two years after Robinson admitted he obtained the products, (Plea Tr. at 19).  Mr. Kunkle also admitted that he discounted the value of <u>all</u> the cosmetics and body treatments, or approximately sixty percent of the goods, on the ground that some states (which have absolutely no connection to this case) have unspecified laws concerning the sale of such cosmetics and body treatments.  (GA 136-37, 141-42, 154).

     Mr. Kunkle estimated that the retail value of the goods, before his discount, was $549,000.  (GA 135, 142). Applying the inapplicable discounts described above, Mr. Kunkle reduced that figure to $219,600.  (GA 142, 144-45).  Mr. Kunkle then further discounted the goods to $32,000, based on his estimate ofthe sale of the items at a liquidation sale, (GA 142),

9

which he admitted did not take into account the possibility that Chanel could sell the goods on the secondary or barter markets for full or near-full retail value, (GA 167). Mr. Kunkle also testified that he was unaware used, damaged, and tester items could be sold on the secondary and barter markets. Mr. Kunkle was also unaware that one of the defendant's co-conspirators was able to sell used, damaged, and tester items at flea markets. Accordingly, Mr, Kunkle's appraisal did not reflect the value of the items in these alternative markets. (GA 168-69).

**ARGUMENT**

Robinson's offense level under the United States Sentencing Guidelines ("Guidelines") as set forth in section 2B1.1 is level 6.[3] U.S.S.G. § 2B1.1. Given the loss amount in this case, a 14 level enhancement is also warranted under section 2B1.1. Id. § 2B1.1(b)(1)(H).

The application note to § 2B1.1 provides that "the greater of actual loss or intended loss" is attributable to the defendant. Id. § 2B1.1 comment (n. 2(A)). "[A]ctual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." Id. § 2B1.1 comment (n. 2(A)(i)-(ii)). Loss amount "need only be proved by a preponderance of the evidence." United States v. Leung, 360 F.3d 62, 67 (2d Cir. 2004) (internal quotation marks omitted); see also United States v. Watts, 519 U.S. 148, 156 (1997) (per curiam). The Supreme Court's holding in United States v. Booker, 543 U.S. 220 (2005), does not change this standard. Under Booker, facts supporting a sentence must be found by a jury when they are either (1) an element of the offense, or (2) permit a higher maximum sentence to be imposed. See United States v. Holguin, 436 F.3d 111, 117 (2d Cir. 2006); see also Blakely v.

---

[3]There is no dispute that 2002 version of the United States Sentencing Guidelines applies. Additionally, the court had inquired whether it need identify a specific loss amount or whether it could simply hold that the loss amount was within a range corresponding to a certain offense level. It is the government's position that the court need only find that loss amount falls within a certain range.

11

Washington, 542 U.S. 296, (2004); Apprendi v. New Jersey, 530 U.S. 466 (2000). "Facts that permit a higher maximum sentence are treated like conditions of guilt of a crime because they effectively function to create a separate offense." Holguin, 436 F.3d at 117; see also Apprendi, 530 U.S. at 495 ("When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as 'a tail which wags the dog of the substantive offense.' " (quoting McMillan v. Pennsylvania, 477 U.S. 79, 88(1986))). Here, judicial fact-finding as to loss amount does not permit a higher maximum sentence to be imposed, because the Guidelines, made advisory by Booker, do not set forth statutory maxima and minima. Therefore, the court may employ the preponderance standard in arriving at a loss amount.

      The Guidelines further provide that "[t]he court need only make a reasonable estimate of the loss." Id. § 2B.1.1 comment n.2(C)) (emphasis added). One of the ways of measuring loss is to determine the fair market value of the goods. U.S.S.G. § 2B1.1 , cmt. n.2(C)(i). The Supreme Court held in United States v. Cartwright, 411 U.S. 546, 551 (1973), that "[t]he fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Moreover, the Second Circuit has stated repeatedly that "in applying the Sentencing Guidelines, loss need not be determined with precision; a

12

sentencing court need only make a reasonable estimate of the loss, given the available information." United States v. Canova, 412 F.3d 331, 352 (2d Cir. 2005) (internal quotation marks omitted); see also United States v. Carboni, 204 F.3d 39, 46 (2d Cir. 2000); United States v. Bryant, 128 F.3d 74, 75-76 (2d Cir. 1997) (per curiam) (citing U.S.S.G. § 2B1.1 and stating that "in establishing sentencing tables that tie a defendant's offense level to the amount of loss caused by his offense, the Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision"). Indeed, "the [Sentencing] Commission has long recognized that the calculation of exact loss amounts in individual cases is no easy task." Canova, 412 F.3d at 352. Mr. Murphy's estimate of the value of the goods, therefore, is certainly a reasonable one.

The testimony of the government's expert witness established that Chanel could have obtained full retail value in some combination of cash, services, or goods from a barter for the seized Chanel products, namely, a value of approximately $650,000. (GA 58, 75-79). The expert testimony also established that Chanel could have obtained approximately twenty percent above wholesale from a secondary agent for the products, or

13

approximately $480,000.[4] (GA 58, 75-79). Even the defense expert, Mr. Kunkle, found that the full retail value of the products was $549,000.[5]

Indeed, there is no serious dispute in this case that the products have significant value on the secondary market. The

---

[4] Furthermore, Mr. Murphy testified that approximately thirty to forty percent of the items seized from Robinson's possession are in first-class condition and could be returned to Chanel's inventory and sold in the regular channels of distribution. (GA 72). An examination of the photographs of the products confirms the foregoing and indicates that may of the other items would need minimal refurbishment, such as plastic wrapping, in order to be suitable for return to Chanel's inventory.

[5] Moreover, Mr. Kunkle admitted that the discounts he applied to that value were based on his erroneous view that the products were outdated as of August 2003, one year after the products were recovered from the defendant, (GA 155-56), and two years after the defendant stated that he purchased the products,(Plea Tr. 19). Mr. Kunkle also admitted that he discounted the value of all the cosmetics and body treatments, or approximately sixty percent of the goods, on the grounds that states with absolutely no connection to this case have some unspecified laws concerning the sale of such cosmetics and body treatments. (GA 136-37, 141-42, 154). Finally, Mr. Kunkle testified that his $32,000 liquidation estimate, (GA 142), did not take into account the possibility that Chanel could sell the goods on the secondary or barter markets, (GA 167), or that such markets would purchase used, damaged, and tester items. (GA 168-69). As noted above, even half-used items have value on the secondary and barter markets. (GA 73-75, 76-79). Furthermore, Richard Lima, one of the defendant's co-conspirators, testified that he was able to sell open boxes, half-used bottles of lotion, and half-used bottles of perfume at his flea market. (GA 207-10).
As an additional matter, Kunkle conceded that even with half of the product being devalued completely, the fair market value of the products was approximately $219,200. Therefore, even using the defendant's valuation, the value of the products on the barter market is approximately $219,200, and the value on the secondary or diversionary market is approximately $157,000. Finally, Mr. Kunkle also admitted that approximately 80 percent of the fragrances were in first quality condition and could have been put back into Chanel's inventory, at a value of approximately $175,200. (GA 144-46).

14

fact that Robinson and his co-conspirators created a business out of selling Chanel and other name brand products on exactly such a market reaping considerable profits removes any doubt to the contrary.[6] (GA 206, 211-12) (testifying that Moffitt and Lima earned approximately $300,000 from the sale of products diverted from the Genco facility over a period of approximately 18 months).

In sum, whether the court credits the government's expert or the defense expert's calculation of the retail value of the seized Chanel goods, the loss attributable to the defendant exceeds $400,000. Accordingly, a 14-level increase is warranted under section 2B1.1(b)(1)(H) in this case.

---

[6]As it is possible to come up with reasonable estimate of loss, the court need not use gain amount as the relevant figure.

15

## CONCLUSION

For the foregoing reasons, the court should find that the a reasonable estimate of the loss amount in this case is $650,000.

Dated:   Brooklyn, New York
         July 14, 2006

                                    Respectfully submitted,

                                    ROSLYNN R. MAUSKOPF
                                    United States Attorney
                                    Eastern District of New York

                           By:      _____
                                    Elizabeth Latif
                                    Assistant U.S. Attorney

16

```
CD:EAL
F#2002R01475
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA
                                            Cr. 02-948(NGG)(SMG)
       -against-

JACK ROBINSON

            Defendant.

- - - - - - - - - - - - - - - - X
```

### DECLARATION REGARDING FILING AND SERVICE

I, Elizabeth Latif, hereby declare that, on July 14, 2006, a copy of the Fatico Brief, Appendix, and Hearing Exhibits for the United States were served by Federal Express on:

Michael G. Dowd
Law Offices of Michael G. Dowd
420 Fifth Avenue, 25th Floor
New York, New York 10018-2729

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:    Brooklyn, New York
          July 14, 2006